IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SABRINA POLKEY,

        Plaintiff,

        v.                            Case No. 3:03cv56/RV/MD

TRANSTECS CORPORATION,

        Defendant.

_____/

## ORDER

Pending is the plaintiff's motion for partial summary judgment. (Doc. 58).

Plaintiff Sabrina Polkey filed this action in the Circuit Court for Escambia County, Florida, alleging a violation of the Employee Polygraph Protection Act ("EPPA") [29 U.S.C. §§ 2001, et seq.] (Count I); race discrimination in violation of the Florida Civil Rights Act ("FCRA") [ch. 760, Fla. Stat. (2002)] (Count II); and "termination without reasonable notice" (Count III).  The defendant, Transtecs Corporation ("Transtecs"),  removed the action to this court.  The parties having had a full opportunity for discovery, Polkey now moves for partial summary judgment on her EPPA claim pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The following facts, unless otherwise noted, are not disputed by the parties.

## I.    FACTUAL BACKGROUND

Since 2000, Transtecs has contracted with the Department of Defense ("DOD") to perform mailroom services at the Naval Aviation Technical Training Center, Naval

Air Station Pensacola, Florida ("NAS Pensacola").[1]  The contract calls for Transtecs and its employees to have "access" to "official use only information," and its facility and safeguard level is "secret."[2]  The DOD also requires Transtecs to "abide by all security regulations for the installation which may be in effect during the contract period and shall be subject to such checks as may be deemed necessary to ensure that no violations occur."

Since October 1, 2000, Polkey had been employed by Transtecs as the supervisor of the five mail clerks in the mailroom.  She had previously worked for Transtecs' contractual predecessor at the mailroom since September 28, 1998.  On Friday, January 11, 2002, after closing for the day, Polkey and mail clerks Joy Ortiz and Maggie Stills, who had all left the building, returned to the mailroom because one of them had forgotten an item in the refrigerator.  When they returned to the mailroom, they discovered that the computer had been left on at the front desk workstation.  Although the front desk workstation may be used by any mailroom employee throughout the day to serve Navy personnel who come to pick up their mail or packages, according to Polkey, mail clerk Ronnie Cole was primarily assigned to the

---

[1]Transtecs is a closely held corporation wholly owned by Godwin Opara and his wife, Margaret.  Godwin Opara serves as the corporation's president, and Maraget Opara serves as the corporation's vice president, secretary, and treasurer.  With over 200 employees, Transtecs performs administrative and clerical services under contract with the Department of Defense at eight military installations throughout the country. For the sake of convenience, unless otherwise noted, all references to "Opara" in the text refer to Godwin Opara.

[2]Although the facility and safeguard levels were "secret," the contract specifically denies Transtecs access to most forms of classified material.  Transtecs' mailroom operation was limited to handling "official use only information", which was handled in the same manner as registered mail.  Although on-site Transtecs employees had filled out applications for security clearance, none of them had received it because the required background investigation had not been performed.

front desk that day.[3]  When Polkey went to turn off the computer, she discovered fourteen opened and undelivered Christmas cards and a bundle of outgoing fliers in a trash receptacle underneath the counter by the front desk workstation.

Polkey immediately contacted Carl Kirtley, Transtecs' on-site project manager and Polkey's supervisor, and informed him that she had found open mail in the trash can and requested that he come to the mailroom immediately.[4]  Kirtley inspected the scene, and Polkey, Ortiz, and Sims accused Cole of opening the mail.  Because it was Friday afternoon, Kirtley told Polkey, Ortiz, and Stills to go home and that he would deal with the issue on Monday morning.  When he returned Monday morning, Kirtley removed the entire trash bag from the trash can and took it to his office.  Kirtley inspected the contents of the trash bag and discovered Cole's pay stub in addition to the opened mail.

Kirtley contacted Connie Clark, the Navy's contracting office representative for NAS Pensacola, to inform her about the incident.  Clark contacted Navy personnel, including the base's executive officer and the base's mail manager, for advice about how to handle an investigation.  Kirtley contacted Transtecs' corporate office and spoke to Carl Petrisor and Godwin Opara.  Opara and Petrisor instructed Kirtley to interview each of the employees and question them about the incident, which Kirtley did.  Each of the employees denied opening the mail.  Clark  arranged for base security to assign a Naval civilian investigator to look into the incident.  The civilian investigator questioned Kirtley and later questioned each of the six mailroom employees, with Kirtley and Clark present.  Again, each of the employees denied opening the mail.

---

[3]Ronnie Cole's last scheduled work day was to be January 17, 2002.  By January 11, 2002, he had already given his two weeks' notice, and he planned to move to Alaska.

[4]Although Kirtley was Polkey's supervisor, he was also in charge of Transtecs' other operations at NAS Pensacola and only visited the mailroom a couple of times a month.

According to Kirtley, after these interviews, he suspected that Cole was the one who had opened the mail.  Kirtley's suspicion was just a hunch, and he had not yet ruled out the other employees.  The civilian investigator from base security informed Kirtley that there was nothing further base security could do.

Clark informed Kirtley that the DOD's mail manager had suggested giving polygraphs to the mailroom employees.  Kirtley and Clark asked the polygraph examiner in the local Naval Criminal Investigative Services ("NCIS") office if he could perform the polygraph examinations.  Because he was going out of town for an extended period, the NCIS polygraph examiner recommended Ted Chamberlain, a part-time polygraph examiner and Santa Rosa County Sheriff's officer, as a possible alternative.  Kirtley contacted Opara at Transtecs' corporate office and informed Opara that it had been suggested that the mailroom employees be given polygraphs.  Opara agreed and directed Kirtley to arrange for polygraph testing of all of the mailroom employees at Transtecs' expense.[5]  Opara also contends that polygraph testing was used to absolve Transtecs of any wrongdoing in case the Government brought charges against the perpetrator.[6]  At some point, Kirtley also spoke to Petrisor, who informed him that, if Transtecs could not determine which individual had opened the mail, all of

_____

[5]However, according to both Godwin and Margaret Opara, the outcome of the polygraph testing was irrelevant because they had already decided to terminate all of the mailroom employees and replace them, regardless of the results.  Apparently, Transtecs had received a contract deficiency report from the DOD with an attached letter from the executive officer at NAS Pensacola describing the incident.  Opara had been instructed by the DOD to take appropriate action to ensure that such an incident did not happen again.  Based on these events, Opara was concerned that Transtecs might possibly lose contracts at other military installations.  The Oparas concluded that, in the absence of an admission by one of the employees, all of the employees needed to be fired.

[6]Though no such charges were ever brought; nor was any criminal investigation ever initiated by the Navy.

the mailroom employees would be terminated.[7]  Petrisor also informed Kirtley that he would be traveling from Transtecs' home office in Wichita, Kansas, to Pensacola to help Kirtley deal with the situation.

A day or two later, Kirtley contacted Chamberlain to arrange the polygraph testing.  Chamberlain faxed Kirtley a general release form and suggested that each of the employees sign the form before taking the test.  The release form did not contain any specific information about the incident, did not state the basis for testing any particular employee, and was not signed by any Transtecs representative.  Kirtley photocopied the release form and took it down to the mailroom.  He then conducted a meeting with all of the mailroom employees and informed them that Transtecs was requesting that each of the employees take a polygraph test as part of the company's investigation of the opened mail.  However, Kirtley told them that taking the polygraph was voluntary and not mandatory.  Kirtley also told the employees that, because the polygraph testing would be conducted at Chamberlain's office in nearby Milton, Florida, he would transport each employee to and from the testing during regular business hours.  He then presented the release form, and each of the employees signed the form.[8]  Kirtley then called Chamberlain and scheduled Cole's polygraph first, apparently for that afternoon.

Kirtley drove Cole to Milton for the testing.  Chamberlain informed Kirtley that the testing would take approximately an hour-and-a-half, and Kirtley left.  When Kirtley returned, he picked Cole up and drove him back to NAS Pensacola.  That afternoon, Chamberlain told Kirtley that the testing had gone well and that he would provide an oral report tomorrow.  The next day, Chamberlain called Kirtley and told him that Cole's performance on the polygraph indicated deception when Cole had denied

---

[7]According to Kirtley, Opara later told him the same thing.

[8]Polkey's release form is not in the record.  None of the release forms signed by the employees were retained by Transtecs.  (G. Opara depo., doc. 66, attach., at 54).

opening the mail.  Chamberlain told Kirtley that he would provide Kirtley with a written report in a few days.  According to Kirtley, he called Opara and informed him of the results, indicating that Cole had lied when asked about opening the mail.  Opara contends Kirtley told him the results were inconclusive.  Kirtley contends that Opara asked him whether he thought that Cole was the one who had opened the mail. Kirtley responded that he thought that Cole "most probably" was, but that he was going to go ahead and schedule polygraphs for the remaining employees.  Opara denies Kirtley ever telling him that he suspected Cole.  (G. Opara depo., doc. 66, attach., at 53).  Kirtley says that he could not positively rule out any of the employees on the basis of Cole's polygraph results alone.  However, Kirtley concedes that he had no reason to suspect that Polkey was in any way involved with the opening of the mail, and that the employees' returning to the office after hours for a forgotten item was neither improper nor raised his suspicion.  (Kirtley depo., doc. 66, attach., at 66). Kirtley also states that Opara told him to give the remaining employees "the option" of taking the polygraph.

Later that week, Kirtley called another meeting of the mailroom employees and informed them that they had the option to take the polygraph test, but that they did not have to do so.  Kirtley admits that he encouraged each of the employees to take the polygraph to clear their name and to show they had nothing to do with the opening of the mail.[9]  Several of the employees, including Polkey, expressed concern about the reliability of polygraph tests and that the polygraph might make them look guilty.  The remaining employees all refused to take the polygraph test.  Kirtley informed Transtecs' corporate office of their decision.  Cole was never confronted with his polygraph test results because that Friday was his last day, and the written report of the results was not received from Chamberlain until the next week.

---

[9]In her affidavit, Maraget Opara states that Polkey was asked to use any method, including going to the police or taking a private polygraph, to clear her name and declare her innocence.  (M. Opara Aff., Doc. 60, ex. 3).

The following Monday, January 21, 2002, Petrisor arrived at the mailroom with Sharon Rogers. The previous week, Petrisor had hired Rogers through a telephone interview for a newly created position called quality control and security coordinator.[10] Kirtley claims that the vacancy created by Cole's resignation was redefined to Rogers' new position, though Rogers was paid a supervisor's hourly rate.[11] Rogers had also been informed by Petrisor that she had a chance for advancement to supervisor in the near future. Rogers was tasked with observing the current operations to determine whether Transtecs was complying with relevant regulations and to identify areas for operational improvement. According to Polkey, when Rogers arrived, she told Polkey that she was the new mail clerk supervisor.

Rogers and Kirtley began observing the mailroom operations. On January 22, 2002, Rogers and Kirtley observed Polkey allowing express and package delivery carriers, such as UPS and Federal Express, to make deliveries to the mailroom's back door without going through the base's security checkpoint. Due to heightened security rules instituted in the fall of 2001, Transtecs had been directed by the NAS Pensacola executive officer not to allow such deliveries at the back door. Instead, all parcel deliveries were required to pass through the gate security checkpoint. Apparently, Opara had spoken with Polkey directly about this practice in the latter part of 2001 after he had visited Transtecs' Pensacola operations. Opara had informed her that no one was permitted to make deliveries to the back door without passing through security, regardless of how well Polkey knew the delivery person. According to Kirtley, he informed Petrisor of Polkey's conduct and spoke with Polkey, telling her

---

[10]According to Margaret Opara, Petrisor had been sent to Pensacola, at the direction of her and her husband, to hire Polkey's replacement and to soothe the DOD's concerns about the mail opening incident. (M. Opara depo., doc. 66, attach., at 9-10).

[11]According to Kirtley, by the time Rogers arrived, he had already been instructed by Godwin Opara that all of the current mailroom employees would be terminated.

to stop the practice because it was a violation of procedures.  Polkey maintains that she followed the proper procedures.  The next day, Kirtley again saw Polkey allowing a UPS delivery through the mailroom's back door.  Kirtley again informed Petrisor, who directed Kirtley to fire Polkey.  Kirtley fired Polkey at the end of the day.  Godwin Opara, who admits that he knew Polkey had refused to take the polygraph test, says that her refusal to do so did not change his impression of Polkey's honesty, and that Polkey was going to be fired anyway, along with all of the other employees, but that she was fired sooner because of the security violations.  Margaret Opara said that Polkey's termination was based on both the fact that she was the mailroom supervisor during the mail opening incident and her violation of security procedures.  (M. Opara depo., doc. 66, attach., at 8, 18).

The next day, on January 24, 2002, Rogers was promoted to Polkey's position without a change in pay.  Transtecs then began increasing its staffing in the mailroom in order to train the employees necessary to replace the mail clerks who worked in the mailroom during the incident.  Transtecs eventually fired all of the remaining mail clerks on April 1, 2002.  Rogers was not involved in the decision to terminate the remaining employees, and was told that their termination was based on the mail opening incident that had occurred before she began working for Transtecs.  After Rogers became mailroom supervisor, through a security procedure she worked out with the base's quartermaster, outside express and parcel delivery services continued to be allowed to make deliveries to the mailroom's back door.  A mailroom employee was required to call the quartermaster to obtain permission to open the back door when the delivery person arrived.  A mailroom employee would then open the back door, allow the delivery person to make the delivery, and secure the back door when the person left.

## II.   DISCUSSION

### A.   Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); see also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986).  It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  See id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact.  See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983).  On the other hand, if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, then the issue of fact is genuine.  See Matsushita Elec. Indus. Co., supra, 475 U.S. at 586, 106 S. Ct. at 1356.  On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party.  Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

B.    EPPA Claim

Enacted in 1988 to curtail what Congress considered to be the widespread and often unjustified use of lie detectors by private employers,[12] the EPPA broadly prohibits employers from directly or indirectly requiring, requesting, or even suggesting that an employee take or submit to a lie detector[13] test and from taking any adverse employment action against the employee based on the employee's refusal to take such a test.  29 U.S.C. § 2002(1), (3)(A).  The EPPA provides for both public enforcement by the Secretary of Labor and private enforcement by aggrieved employees.   29 U.S.C. § 2005(a)-(c).   The broad prohibitory language in Section 2002 creates a presumption than any employer request that an employee take a lie detector test is unlawful unless the employer proves, in the nature of an affirmative defense, that the request was made pursuant to one of the EPPA's enumerated, and limited, exemptions provided in Section 2006.  See 29 U.S.C. § 2006.  Polkey has alleged two separate violations of Section 2002: an unlawful request that she take a lie detector test under Section 2002(1) and an unlawful discharge under Section 2002(3)(A) based on her

---

[12]Specifically, the Senate Committee on Labor and Human Resources found:
> [T]he reliance placed upon the polygraph machine by private sector employers making employment decisions, in most situations, is misplaced and unwarranted….[M]any employers and polygraph examiners abuse and manipulate the examination process, and frequently use inaccurate or unfounded results to justify employment decisions which otherwise would be suspect.  While this abuse is not true of all employers or examiners, it is sufficiently widespread to warrant congressional action.  Employees and applicants are being unjustly terminated or denied employment not because of their own shortcomings but due to the intentional and unintentional misuse of the polygraph exam and due to the inherent inaccuracies of the most common testing processes.

S. Rep. No. 100-284, at 46, reprinted in, 1998 U.S.C.C.A.N. 733-34.

[13]The EPPA defines the term "lie detector" to include a polygraph.  29 U.S.C. § 2001(3).

refusal to take the lie detector test.    However, her motion only seeks summary judgment as to her Section 2002(1) "request" claim, and so I only address that claim.[14]

       1.    <u>Unlawful Request or Suggestion that Employee Take a Polygraph</u>

Title 29, United States Code, Section 2002(1) makes it unlawful for any employer engaged in commerce "directly or indirectly, to require, request, suggest, or cause any employee…to take or submit to any lie detector test."  To establish a prima facie violation of this subsection, the employee need only prove that the employer requested or suggested that the employee take a lie detector test.  Once the employee has carried this exceedingly light burden, the burden of proof then shifts to the employer to prove that the request was made in accordance with an exemption under Section 2006.  Here, Transtecs does not dispute that it requested that Polkey take a lie detector test.    In fact, it made two requests: one before Cole's polygraph examination and one afterwards.

Transtecs' argument that no violation of Section 2002(1) occurs unless the employee actually takes the test is wholly without merit because the statute plainly forbids direct or indirect requests or suggestions separately from the EPPA's significant restrictions on how tests are performed.  In this respect, the EPPA's prohibition on employer requests or suggestions (be they direct or indirect) is extremely broad, perhaps more broad than Congress intended.  <u>See</u> S. Rep. No. 100-284, at 47, <u>reprinted in</u> 1988 U.S.C.C.A.N. 726, 736 ("S. 1904 totally bans <u>use</u> [*i.e.* not "requests" or "suggestions"] of [lie detectors] by employers upon employees and

---

       [14]I note, though, that Polkey's Section 2002(3)(A) claim that she was discharged on the basis of her refusal to submit to a lie detector test appears to comprise the lion's share of her damages on Count I.  In light of the various and conflicting reasons asserted for Polkey's discharge by the defendant, such a claim might appropriately be analyzed under a mixed-motive framework like that utilized for evaluating other federal discriminatory discharge claims. <u>See</u>, <u>e.g.</u>, <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003).

prospective employees and the limited specific incident exemption contained in Section 7(d) is only for polygraph examinations, where there is some evidence of validity.") (emphasis added). An unlawful request or suggestion by itself is a cognizable injury under the EPPA.  Even where the request is made pursuant to a legitimate EPPA exemption and the employee refuses, the request itself is unlawful unless the employer complies with all of the EPPA's relevant procedural requirements.  See 29 U.S.C. §§ 2006(d), 2007.  Although one can certainly question Congress's wisdom in enacting this law and whether it comports with either the Constitution or common sense, there is no constitutional challenge in this case and I have assumed that the law represents a proper exercise of Congress's legislative authority.  The predictable result of Congress's heavy handed prohibition has been, as Congress apparently intended, the legal elimination of the use of polygraphs by private employers, though they continue to be widely used by law enforcement and government employers.  A further result is that the EPPA is a rarely-litigated statute.  See, e.g., Mennen v. Easter Stores, 951 F. Supp. 838, 848 (N.D. Iowa 1997)("Although Congress passed the EPPA eight years ago, a court applying the Act still finds itself in relatively unchartered territory, as case law applying the EPPA is sparse.").

Transtecs claims its requests were made pursuant to the exemption for ongoing investigations in Section 2006(d).[15]  Title 29, United States Code, Section 2006(d)

---

[15]To the extent that Transtecs tries to reassert that it is entitled to the national defense and security exemption under Section 2006(b)(1)(A), I have already considered and rejected that argument.  (See Order of July 14, 2003, doc. 42, at 5-8)("Transtecs' reliance upon the national defense exemption to the EPPA is not well founded.").  No record evidence made available to this court since that time changes my prior determination.  Equally unavailing is Transtecs' argument that it was acting in conjunction with, or as the agent of, the federal government when it requested that its employees take a polygraph.  The record is undisputed that the mail opening incident was investigated by base security and left to Transtecs to resolve.  The suggestion by government officials that Transtecs might consider giving employees polygraphs was just that: a suggestion.  While it is true that because of Transtecs'
(continued...)

provides that:

> Subject to sections 2007 and 2009 of this title, this chapter shall not prohibit an employer from requesting an employee to submit to a polygraph test if:
>
> (1) the test is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business, such as theft, embezzlement, misappropriation, or an act of unlawful industrial espionage or sabotage;
>
> (2) the employee had access to the property that is subject of the investigation;
>
> (3) the employer has a reasonable suspicion that the employee was involved in the incident or activity under investigation; and
>
> (4) the employer executes a statement, provided to the examinee before the test, that:
>
>> (A) sets forth with particularity the specific incident or activity being investigated and the basis for testing particular employees,
>>
>> (B) is signed by a person (other than a polygraph examiner) authorized to legally bind the employer,
>>
>> (C) is retained by the employer for at least 3 years, and
>>
>> (D) contains at a minimum:
>>
>>> (I) an identification of the specific economic loss or injury to the business of the employer,
>>>
>>> (ii) a statement indicating that the employee had access to the property that is the subject of the investigation, and
>>>
>>> (iii) a statement describing the basis

---

[15](...continued)

need to keep the government happy as to its ability to deal with mail handling problems, the government's "suggestion" is effectively Transtecs' "command," Transtecs chose to act on that suggestion of its own accord, and in so doing went beyond mere passive cooperation with law enforcement authorities.  Cf. 29 C.F.R. § 801.4(b).

> of the employer's reasonable
> suspicion that the employee was
> involved in the incident or activity
> under investigation.

29 U.S.C. § 2006(d).  An employer must prove strict compliance with each of the exemption's requirements in order for the exemption to apply.

It appears to be undisputed that there was an "ongoing investigation" of the mail opening incident and that it constitutes an "investigation involving an economic loss or injury to [Transtecs'] business."  Transtecs was charged with performing mail services at NAS Pensacola and thus was custodian of the mail while in its possession. The Secretary of Labor's interpretive regulations provide that the injury to the property of another placed under the managerial responsibility of the employer constitutes an economic injury to the employer's business [29 C.F.R. § 801.12(c)(1)(v)], and I defer to the Secretary's reasonable interpretation of the statute.[16] Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2728, 81 L. Ed. 2d 694 (1984).  It is likewise undisputed that, like all of the other mailroom employees, Polkey had access to the mail.  The only material disputes on this issue revolve around the latter two requirements of the "ongoing investigation" exemption.

    a.   Providing a Written Statement

Polkey contends that Transtecs is not entitled to the ongoing investigation exemption because it failed to provide her with a written statement that complied with Section 2006(d)(4).  It appears to be undisputed that the release form signed by Polkey and the other mailroom employees failed to comply with Section 2006(d)(4). Instead, Transtecs contends that a Section 2006(d)(4) written statement need not be provided at all where the employee refuses the employer's request to take the test.

Section 2006(d)(4) provides that an employer is only entitled to the ongoing

---

[16]Congress specifically gave the Secretary the authority to issue "such rules or regulations as may be necessary or appropriate to carry out this chapter."  29 U.S.C. § 2004(a)(1).

investigation exemption where "the employer executes a statement, provided to the examinee before the test, that" satisfies the remaining statutory requirements.  The statute does not require that the employee be provided with the statement at the time the request is made.  Nor does an "employee" become an "examinee" until at least he or she agrees to be examined.  Congress's use of these two separate terms indicates an intention that only "examinees" (that is "employees" who have agreed to be examined) be provided the required written statement.  The Secretary of Labor's regulations require that the statement be provided to the examinee at least forty-eight hours before the polygraph test is given in order for the examinee to be given time to consult with counsel or an employee representative about the testing.[17]  29 C.F.R. § 801.12(g)(2).  An employee need not consult with counsel about a polygraph test she has refused to take.  Reading the statute and regulations together, it seems clear that an employer need only provide the employee a written statement where the employee agrees to take the polygraph, and the statement need not be provided until forty-eight hours before the scheduled polygraph is to occur.  Because Polkey refused Transtecs' second request, before her polygraph was ever even scheduled, Transtecs' duty to provide her with the written statement never materialized,[18] and thus Transtecs did not forfeit the ongoing exemption investigation because of its failure to provide Polkey

---

[17]Consultation with counsel or an employee representative is required by the regulations because any admission by the employee during the polygraph testing may form the basis for adverse employment action by the employer and may be turned over to law enforcement when it amounts to an admission of criminal conduct.  29 U.S.C. §§ 2007(b)(2)(D)(ii), 2008(c)(2).

[18]Even if each of Transtecs' requests were to be considered a separate injury, with Polkey initially agreeing to take the polygraph by signing the release form, Transtecs' duty to provide the Section 2006(d) written statement did not arise because Polkey's polygraph had not yet been scheduled.

with a written statement.[19]

    b.    <u>Reasonable Suspicion</u>

Polkey also contends that Transtecs lacked reasonable suspicion to request that she take a polygraph.  An employer's request that an employee take a polygraph test is not exempted by Section 2006(d), and is deemed unlawful by Section 2002(1), unless supported by reasonable suspicion that the employee was involved in the incident.  To constitute "reasonable suspicion", an employer must have "an observable, articulable basis in fact which indicates that a particular employee was involved in, or responsible for, an economic loss."  29 C.F.R. § 801.12(f)(1); <u>see</u> <u>also</u> S. Rep. No. 100-284 at 49, <u>reprinted in</u> 1988 U.S.C.C.A.N. 726, 736.  "Access in the sense of possible or potential opportunity, standing alone," is insufficient to warrant requesting that an employee submit to a polygraph.  <u>Id.</u>  However, the totality of the circumstances surrounding the nature of the access, such as its unusual character or the fact that access was limited to a single individual, may form the basis for reasonable suspicion.  <u>Id.</u>  Also, inconsistencies between facts, claims, or statements made by employees during an investigation may form the basis for a reasonable suspicion.  Reasonable suspicion must be based upon facts known to the employer regarding the specific employee whom the employer intends to test.  Blanket testing of all employees with access to the property merely based on the fact of access is prohibited by the EPPA.

When viewed in light of this standard, the evidence in the record demonstrates that the information Transtecs possessed prior to the time it made the first request

_____

[19]I note that one could possibly conclude from the statutory and regulations, that an employer might be required to <u>execute</u> the written statement <u>before</u> making an initial request, and then provide it to the employee after the employee consents and within forty-eight hours before the test is scheduled.  Polkey does not advance that argument, nor do I find it to be the required procedure.

that Polkey take a polygraph test was enough to constitute reasonable suspicion. Kirtley concedes that he had no basis to specifically suspect that Polkey, alone, opened the mail, but he could not rule out any of the mailroom employees.  The evidence was very strong that one or more of the six employees in the mailroom had opened the fourteen Christmas cards, presumably to take cash enclosed with the cards.  Kirtley concedes that there was nothing unusual about Polkey and the other mailroom employees returning to the office after hours to retrieve a forgotten item. Kirtley does indicate  that after his interview with Cole, Cole was a suspect.[20]  The fact that all of the employees with access denied involvement does not, by itself, support a basis for reasonable suspicion with respect to any particular employee. Nevertheless, any reasonable person considering the facts known to Kirtley would conclude that the mail had been opened by someone in the mailroom; that it could have been a collusive effort; and that the perpetrator(s) may be attempting to shift suspicion to another.  Therefore, the fact that Polkey immediately reported the incident to Kirtley and informed Kirtley that Cole was primarily using the front desk workstation that day, does not necessarily remove her from suspicion, but instead may add to it.

Once Kirtley learned from Chamberlain that Cole had failed his polygraph examination, Cole was the obvious suspect.  The possibility that Polkey was attempting to shift suspicion from herself to Cole nearly vanished, if one assumes that the polygraph results are reliable - - - a fact which the law obviously discourages. Nevertheless, a reasonable person would conclude that, in the absence of any evidence of collusion, Polkey was no longer a reasonable suspect.  Yet, Kirtley again requested that Polkey and the remaining mailroom employees take the polygraph to

---

[20]The fact that Cole was assigned to the front desk workstation that day, that he had already submitted his resignation, that his pay stub was found in the trash can, and his suspicious performance during the employee interviews was more than sufficient to request that Cole take a polygraph.

Case No.: 3:03cv56/RV/MD

clear their name.  Wanting employees to clear their name cannot form the basis for reasonable suspicion.  Although an employee may voluntarily express a desire to take a polygraph to clear his or her name,[21] the EPPA forbids an employer from requesting or suggesting that the employee do so without some other basis for reasonable suspicion of the employee's involvement.  Nor may an employer suggest blanket polygraph testing of all employees with access to the stolen property to absolve the employer of any responsibility for the theft.  To do so would remove the statutory requirement of reasonable suspicion altogether.  Because the totality of the evidence in the record establishes  that, at the time of the second request, Transtecs lacked a reasonable suspicion about whether Polkey was involved in opening the mail, Transtecs is not entitled to claim the ongoing investigation exemption under Section 2006(d).  The plaintiff's motion for summary judgment as to her claim under Section 2002(1) must be granted.

This is a troubling result, for it illustrates the EPPA's heavy handed proscription of employer polygraph requests.  In the face of obviously illegal conduct which might jeopardize its relationship with the DOD and under pressure from the DOD to take corrective action, Transtecs clearly had probable cause to believe that it had both a thief and a liar among its mailroom employees after they all denied opening the mail.  Also, the polygraphs were to be given by a trained law enforcement professional in a controlled setting.  The reliability concerns raised by Congress in enacting the EPPA

---

[21]See S. Rep. No. 100-284, at 47, reprinted in 1988 U.S.C.C.A.N. 726, 734 ("If the employee wishes to 'clear' himself or herself, that option is still available, although the data on false-positives…suggest even in these circumstances the error rate is sufficiently high to warrant the further prohibition that employers not take adverse employment action based on the analysis of test results without additional supporting evidence.").

are simply not present.[22]   Though once subject to a per se rule of inadmissibility, polygraph results may now be admitted as evidence in criminal trials in federal court. See United States v. Piccinonna, 885 F.2d 1529, 1535-36 (11th Cir. 1989)("There is no question that in recent years polygraph testing has gained increasingly widespread acceptance as a useful and reliable scientific tool.").  If federal courts are willing to admit polygraph results as evidence in criminal trials, where the rules of evidence are designed to protect an innocent defendant, it would seem that employers faced with plainly illegal conduct in their workplace should have some leeway to request that employees take a polygraph (which the employee may refuse without fear of reprisal).  Under the EPPA, however, they do not. The plaintiff has established that Transtecs violated the EPPA and she is entitled to summary judgment on her Section 2002(1) "request" claim.

III.    CONCLUSION

    For the foregoing reasons, the plaintiff's motion for partial summary judgment as to liability on her "request" claim under Section 2002(1) is GRANTED.  The amount of damages, if any, and any injunctive or other equitable relief to which the plaintiff is entitled, will be reserved for trial.

    DONE and ORDERED this 9th day of March, 2004.

    /s/ Roger Vinson
    **ROGER VINSON**
    **Chief United States District Judge**

---

[22]"Current research indicates that, when given under controlled conditions, the polygraph technique accurately predicts truth or deception between 70% and 90% of the time.  Remaining controversy about test accuracy is almost unanimously attributed to variations in the integrity of the testing environment and the qualifications of the examiner."   United States v. Posado, 57 F.3d 428, 434 (5th Cir. 1995)(citations omitted).   When one considers that the standard burden of proof in non-criminal judicial matters is a mere preponderance of the evidence (say, 51%), then the 70% to 90% reliability is significant.